## Payne et al. v. Commonwealth.

(Decided Feb. 12, 1935.)

TERRY L. HATCHETT and J. R. WHITE for appellants.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CLAY—Affirming.

Dora Payne and Notie Payne Dunbar appeal from a judgment convicting them of manslaughter, and fixing the punishment of the former at ten years' imprisonment and of the latter at twenty-one years' imprisonment.

The facts are: Notie Dunbar, who had been living in Detroit, and her sister, Dora Payne, resided with their father, Hayden Payne, who lived in Tracy, a village located in a remote section of Barren county. Early on the morning of May 12, 1934, several neigh-

bors were aroused by the ringing of the farm bell, and immediately went to the Payne home. On their arrival they were informed that Hayden Payne, the father of appellants, had been found dead. On examining the premises they found Hayden Payne, a one-armed and one-eyed man, 66 years of age, in a kneeling posture by the side of his bed, with his head resting upon his arm, which was upon the bed. Wrapped three times around his neck was a calf rope which was not taut. One end of the rope was looped over his hand and he was dead. There were some slight abrasions on the face of the deceased, and above his left ear was a wound which was made by a blunt instrument and caused his death.

On being asked how their father came to his death, appellants replied that they did not know. They further stated to those present that after they had dressed, come downstairs, and performed certain household duties, Notie Dunbar opened the door to her father's room and found him in the same condition he was in when the neighbors came. She then summoned Dora. After examining their father and finding that there was no pulse beat or heart action, they rang the bell for the purpose of summoning their neighbors. They made practically the same statement before the coroner's jury, and also on the trial.

Appellants are not now represented by the same counsel who defended them on the trial. The only ground urged for reversal is that appellants were not represented by a competent and sane lawyer, and that when they told him the truth as to the homicide he advised them not to tell that, but to tell exactly what they had told the coroner's jury. In support of this ground appellants filed several affidavits to the effect that because of inebriety their counsel was not competent. They also filed their own and their brothers' affidavit to the following effect: They were advised by others that their counsel was a reliable, sober, painstaking, competent lawyer. After employing him they advised him that the real facts as to the homicide were as follows: The deceased attacked Notie Dunbar with a hammer. She grabbed him and hugged his arm against his side so that he could not strike her. They then fell to the floor and the deceased managed to get on top of her. She continued to hold his hand containing the hammer and screamed for her sister to come and pull him off. Her sister came running in, grabbed

him, and tried to pull him off, but could not. About that time she threw a rope around his neck, and when she did that he loosened his hold and Notie got the hammer out of his hand and hit him in the head with it. When they found out that their father was dead, they became frightened. They did not know that they had a right to take his life in their own defense and decided to make it appear as a suicide. At the coroner's inquest they both denied any knowledge of how their father came to his death because they believed that if either admitted that she did it they would either be electrocuted or sent to the penitentiary for life. At that time they had not advised with any lawyer or with any friends, and laboring under that impression they told at the coroner's inquest what they had told before the jury at the trial. Upon telling the facts to their lawyer, he said:

"Hush, hush, I am your lawyer, but do not tell me that, do not tell that to anyone, but tell just exactly what you told at the coroner's inquest."

After that they saw their lawyer on three other occasions, and he insisted that they stick to the story they had told at the coroner's inquest.

The argument is that the uncontradicted evidence shows that the counsel whom appellants selected was almost continuously under the influence of intoxicating liquor, and by reason thereof was incapacitated to represent them; that appellants were ignorant and unacquainted with their rights and the forms of law; that on account of their great fear, and before they had an opportunity to advise with their friends, they tried to make it appear a case of suicide, and told not only their neighbors who appeared on the scene, but the coroner's jury, that they knew nothing of the facts connected with their father's death; that, notwithstanding the apparent falsity of their statements, their counsel when told the exact truth in regard to the matter advised them not to tell the truth, but to stick to the story they had originally told; and that for these reasons they were denied the right to be heard by counsel as guaranteed by section 11 of the Constitution. This is not a case where the court itself appointed incompetent counsel, or where the accused were denied the right to employ counsel, or a reasonable opportunity to confer with counsel, or a case where counsel was not afforded a reasonable time for the preparation of the case. Nor is it a case where the accused were mentally incapable of selecting counsel.

746

On the contrary, their own testimony indicates that they are not below normal in education and intelligence. Nor is it a case where it appeared to the court that counsel selected by the accused was so incompetent as practically to amount to no representation at all. Though it is claimed that because of his inebriety counsel was incompetent to represent them, the only act of incompetency or misconduct relied upon is the fact that counsel, though assured of the truth, advised the accused to adhere to their original story. It does not appear from the record that counsel was given the opportunity to deny this claim, or to rebut the affidavits. We shall therefore consider the question in the light of the facts presented. Appellants fabricated the story of suicide before they ever saw counsel, told it to their neighbors, repeated it before the coroner's jury, and swore to it at their subsequent trial. Though they claimed that when told the truth counsel advised them to adhere to their original story, how was counsel to know what was the truth? If the first story was lacking in plausibility, so was the second story that her one-armed and one-eyed father first assaulted Notie with a hammer, that she held his hand containing the hammer and screamed for her sister Dora, and that Dora, after finding that she could not pull her father off her sister, threw a rope around his neck and caused him to loosen his hold. In view of this situation it would be going far to assume that counsel actually knew that the second story and not the first was true. But, assuming without deciding that he did, the case is simply one where appellants were advised to stick to a defense which they themselves had fabricated and had told to others, including the coroner's jury, and perjury on advice of counsel is not a ground for a new trial.

Judgment affirmed.